2020 IL App (1st) 19-0118-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
December 15, 2020

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the Circuit Court of |
| Respondent-Appellee, | ) | Cook County, Illinois, |
| | ) | Criminal Division. |
| v. | ) | |
| | ) | No. 00 CR 10872 |
| LESTER DOBBEY, | ) | |
| | ) | |
| Petitioner-Appellant. | ) | The Honorable |
| | ) | Michael B. McHale, |
| | ) | Judge Presiding. |
| | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justice Pucinski concurred in the judgment.
Justice Lavin dissents.

**ORDER**

¶ 1    *Held*: The circuit court erred in denying the petitioner's petition for leave to file his successive postconviction petition, where the petitioner established the requisite cause and prejudice with respect to his as-applied proportionate penalties challenge to his 51-year *de facto* life sentence.

¶ 2    The petitioner, Lester Dobbey, appeals from the circuit court's denial of his *pro se* petition for leave to file a successive postconviction petition pursuant to the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)).  On appeal, the petitioner argues that he sufficiently

established both cause and prejudice so as to be granted leave to file his successive postconviction petition alleging that, as applied to him, his mandatory 51-year *de facto* life sentence imposed for an offense committed when he was only 19 years old violated both the eighth amendment (U.S. Const., amend. VIII) and the Illinois proportionate penalties clause (Ill. Const. 1970, art. I, § 11). For the following reasons, we reverse and grant the petitioner leave to file a successive postconviction petition.

¶ 3                                            II.  BACKGROUND

¶ 4        In 2000, the 19-year-old petitioner was charged with multiple counts of first-degree murder, attempted first degree murder, aggravated battery with a firearm, aggravated discharge of a firearm and aggravated battery, for his March 31, shooting of three victims, Dorsey Williams, Michael Cole, and Terence Robinson, which resulted in Williams' death.

¶ 5        Briefly stated, the evidence presented at the petitioner's jury trial revealed that Cole and the petitioner knew each other as members of rival street gangs (the Gangster Disciples and the Mickey Cobras respectively).  Their relationship prior to March 31, 2000, consisted of multiple confrontations.  The most significant was on February 25, 2000, when shots were fired at the petitioner from a van in which Cole was a passenger. While the petitioner suffered multiple gunshot wounds in this incident, Cole was never charged in the offense.

¶ 6        At about midnight on March 31, 2000, Cole was driving with his friend Robinson and his uncle Williams.  Robinson was asleep in the backseat and Williams was riding in the front passenger seat. As their car approached the intersection of 92nd Place and St. Lawrence Avenue, Cole heard six gunshots. Both Williams and Cole were struck by bullets (Cole in the arm and Williams in the chest).  When Cole turned and looked back, he saw the petitioner standing on the corner, fifteen to twenty feet from them, firing a rifle.  Cole's view of the

petitioner was unobstructed, and he looked at him for about two to three seconds. The gunfire awoke Robinson. He moved to the driver's seat, took over the wheel from Cole, and drove them to a nearby gas station to get help. Robinson later testified that he heard both Cole and Williams identify the petitioner as the shooter.

¶ 7       After an ambulance arrived, Williams was transported to the hospital where he eventually died from his gunshot wounds. While at the gas station, Cole provided the police with a description and approximate address for the petitioner. The next morning, the police showed Cole a photo array, from which he identified the petitioner as the shooter.

¶ 8       The petitioner was arrested on April 2, 2000. After initially providing the police with several different alibis that did not hold up and being identified by Cole in a lineup on April 3, 2000, the petitioner agreed to provide a handwritten statement to Assistant State's Attorney (ASA) Eileen Austin Murphy. That statement was read to the jury. In it, among other things, the petitioner stated that at about 10 p.m. on March 31, 2000, Cole drove by and aimed a gun at him. Prompted by this, the petitioner obtained a rifle, and walked to the corner of 92nd Place and St. Lawrence Avenue. When Cole drove by the intersection, the petitioner shot at the car approximately 10 times. The petitioner affirmatively stated that he intended to shoot Cole.

¶ 9       At trial, the petitioner offered no evidence on his own behalf. After deliberations, the jury found the petitioner guilty of the first-degree murder of Williams and the attempted first-degree murder or Cole. The jury also found beyond a reasonable doubt that the petitioner discharged the firearm which proximately caused Williams' death. On the other hand, the jury found the petitioner not guilty of the attempted murder of Robinson.

¶ 10       Prior to sentencing, the petitioner informed the court that his counsel was ineffective and

3

that he sought to represent himself. The petitioner subsequently proceeded *pro se* both with his posttrial motion and at sentencing.

¶ 11   During sentencing, the State first offered evidence from several members of the Chicago police, who had personal knowledge of the petitioner's prior criminal background and use of firearms. Most notably, Officer Irvin, who arrested the petitioner in November 1999 for unlawful possession of a weapon, testified that he knew the petitioner was an "enforcer" for the Mickey Cobras who, *inter alia*, "dished out punishment" for the gang. In his attempt at cross-examining Officer Irvin, the *pro se* petitioner admitted to having told the officer of his membership with the Mickey Cobras but denied ever having stated that he was an "enforcer."

¶ 12   In sentencing, the State also offered testimony regarding the petitioner's involvement in the unrelated March 30, 1999, shooting of Jewels Williams. In this regard, two police detectives testified that the petitioner was identified as the driver of a vehicle from which shots were fired at Jewels, in the 9300 block of South Cottage Grove Avenue. On cross-examination, the petitioner asked whether he was ever charged with any offense stemming from this incident, and both detectives indicated that he was not.

¶ 13   The State also offered the testimony of a Cook county correctional officer, who stated that after the petitioner was arrested in the instant case and placed in jail, he was found in possession of an 8-inch sharpened homemade knife.

¶ 14   The State next read two victim impact statements (by Williams' mother and wife) into the evidence.

¶ 15   Subsequently, in aggravation, the State argued that the seriousness of the petitioner's offense,

his extensive prior criminal background and his long-term affiliation with the Mickey Cobras, warranted a "substantial sentence." Relying on the presentence investigation report (PSI)[1], the State pointed out that the petitioner began his criminal career when he joined the Mickey Cobras at only 13 years of age. Specifically, in 1994, the petitioner was first found delinquent of unlawful use of a weapon (UUW) and was sentenced to 30 days detention and one year of probation. Subsequently, in 1996, the petitioner was then found delinquent in two separate cases of: (1) felony and misdemeanor possession of a controlled substance (cannabis); and (2) criminal trespass to a vehicle. The petitioner was sentenced to probation but violated the terms of his release. In 1997, the petitioner was found delinquent of aggravated discharge of a firearm and aggravated assault and was committed to the Juvenile Department of Corrections for nine months. After his release, the petitioner violated the terms of his parole twice and was recommitted on both occasions. In 1999, after being arrested by Officer Irvin, the petitioner was charged and convicted as an adult for unlawful possession of a weapon. He was sentenced to 60 days in Cook County jail, as well as probation. His probation was again terminated unsuccessfully in 2000 when he was arrested in the instant case.

¶ 16    The State argued that the aforesaid criminal background showed that the petitioner had been given numerous opportunities to change his life but that he instead "chose" to continue in his criminal behavior. The State further argued that the petitioner had "no excuse" for his actions. As the State pointed out, according to the PSI, the petitioner had a good childhood, lived in a nice neighborhood with both parents (who were educators), and was neither abused nor neglected. The petitioner was in good health and stated that he chose to leave school in ninth

---

[1] The record reveals that before the PSI was introduced into evidence, the court asked the petitioner whether he believed any corrections needed to be made. The petitioner indicated that he did not yet have an opportunity to review the PSI, but then stated that it was "alright" to proceed.

grade because he was "tired of it." The State further argued that the petitioner had never been gainfully employed, had not been involved in any community or social organizations, and despite having fathered a child, had never paid any child support.

¶ 17    The State further argued that the petitioner had no concept of his own behavior or reality as he stated in the PSI that he had no problems with drugs but admitted that he began using marijuana at the age of 14 and smoked "two to three blunts a day." The State further argued that the petitioner's repeated and spurious allegations against numerous trial witnesses, the prosecutor, his defense counsel, and the court, were indicative of the petitioner's character, namely his lack of remorse, and his inability for future rehabilitation. Under these facts, the State asked the court to impose a substantial sentence.

¶ 18    After hearing the evidence in aggravation, the trial court asked the petitioner whether he had anything to offer in mitigation and the petitioner stated: "No." The trial court then sentenced the petitioner to consecutive terms of 45 years' imprisonment for first degree murder (the minimum 20 for murder plus the mandatory 25-year firearm enhancement) and the minimum 6 years' imprisonment for attempted murder. In doing so, the court stated:

> "Unfortunately, [the petitioner] has had a very disruptive life and has been involved in criminal activity ever since early childhood, since the age of 13 at least, at which time he was brought before the Juvenile Court system. This was a very senseless killing and should have been avoided at all cost. However, [the petitioner's] lifestyle and gang activity involved him in these types of situations on an ongoing basis, and, as a result, we have the death of Dorsey Williams and also the attempt first degree murder of Michael Cole."

The court then indicated that it believed that "the sentence should be substantial," but that under the present circumstances, "the minimum" was "substantial." As the court explained:

"I believe that attempted murder is an 85-percent sentence, so [the petitioner] should be released from the [p]enitentiary around the age of 70, hopefully, and history has shown that, at this age, most [d]efendants don't [*sic*] have any desire or inclination to get themselves further involved in criminal activity, even though he will spend the majority of his life behind bars, but, hopefully, he will seek out some meaningful skills and trades so that, if and, when, he is released, he will be a productive member of society."

¶ 19    The petitioner appealed his conviction and sentence, arguing, *inter alia*, that the trial court erred by allowing him to proceed *pro se* on his posttrial motion and at sentencing, and without adequately admonishing him about the proper sentencing range for murder as was required under Illinois Supreme Court Rule 401(a) (Ill. S. Ct. R. 401(a) (eff. July 1, 1984)). On October 8, 2004, we affirmed the petitioner's conviction but remanded the case for a new post-trial motion and sentencing hearing. *People v. Dobbey*, No. 1-02-3452 (Oct. 8, 2004) (unpublished order pursuant to Illinois Supreme Court Rule 23). In doing so, we held that on at least one occasion during the sentencing hearing the trial court misled the *pro se* petitioner into believing that the minimum sentence on his murder conviction was 20 rather than 45 years' imprisonment, as a result of the mandatory firearm enhancement. *Id.*

¶ 20    On remand, the petitioner again chose to represent himself. Prior to any hearings, the trial court fully admonished the petitioner in accordance with Supreme Court Rule 401(a) (Ill. S. Ct. R. 401(a) (eff. July 1, 1984)). On August 18, 2005, the petitioner filed another *pro se* motion for a new trial, raising 67 claims of error. A hearing was conducted before the same trial judge who had presided over the petitioner's trial and original sentencing hearing. At the outset, the State indicated that it "would rely on the evidence earlier presented at the initial sentencing hearing." The State then made identical arguments in aggravation to those it had raised earlier. Namely,

the State argued that the seriousness of the offense, the petitioner's prior criminal background, gang involvement, and good home life reflected his "choice" to continue in his criminal behavior and his incorrigibility. Again, the *pro se* petitioner was asked whether he had any evidence or arguments to offer in mitigation and he indicated that he did not. After hearing the State's arguments, the trial court sentenced the petitioner to the same "minimum consecutive prison terms" it had previously imposed, this time without providing any rationale.

¶ 21    After the petitioner was advised of his appellate rights, he indicated that he "wanted to file a notice of appeal." At this point in the proceedings, the trial court stated: "I don't know why his [PSI] isn't in the file." The State responded that it knew that a PSI had been received by the trial court because the State's own copy reflected that it had been file-stamped on August 9, 2002, the date of the original sentencing hearing. The State offered to give its copy to the trial court, but the court indicated that this would not be necessary.

¶ 22    The petitioner's second direct appeal was subsequently taken by this court. This time the petitioner solely argued that the trial court prematurely denied his *pro se* motion for a new trial alleging ineffective assistance of trial counsel without an evidentiary hearing. On March 20, 2008, we again affirmed the petitioner's conviction and sentence. See *People v. Dobbey*, No. 1-05-2800 (Mar. 20, 2008) (unpublished order pursuant to Illinois Supreme Court Rule 23). The petitioner sought but was denied leave to appeal to the Illinois Supreme Court. *People v. Dobbey*, 229 Ill. 2d 637 (2008). His subsequent petition for writ of certiorari to the United States Supreme Court was also denied. *Dobbey v. Illinois*, 555 U.S. 1180 (Feb. 29, 2009).

¶ 23    After exhausting his direct appeal options, the petitioner spent the next 12 years filing and appealing a multitude of collateral actions both in state and federal court. We summarize only that procedural history relevant to the issues raised in this appeal.

¶ 24    On February 9, 2010, the petitioner filed his initial *pro se* postconviction petition, alleging numerous claims of prosecutorial misconduct, trial court error, and ineffective assistance of counsel. The trial court summarily dismissed the petition on March 18, 2009. We affirmed that dismissal on August 19, 2011. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 77. The petitioner's subsequent appeals to the Illinois Supreme Court and the United States Supreme Court were both denied. See *People v. Dobbey*, No. 1-11-3346 (Jan. 30, 2013) (leave to appeal denied); *Dobbey v. Illinois*, 574 U.S. 828 (Oct. 6, 2014) (writ for certiorari denied).

¶ 25    On May 9, 2013, the petitioner sought leave to file his first successive post-conviction petition raising an actual innocence claim. The petitioner's motion for leave to file his successive petition was denied on July 26, 2013. On February 26, 2015, we allowed the Office of the State Appellate Defender (OSAD) leave to withdraw as petitioner's counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987) and affirmed the trial court's judgment. See *People v. Dobbey*, 2015 IL App (1st) 133607-U, *pet. for leave to appeal denied*, No. 1-11-9354 (Sept. 30, 2015).

¶ 26    Turning to the instant matter, on May 16, 2017, the petitioner filed his second *pro se* successive postconviction petition, without first seeking leave of court. In his petition, the petitioner alleged, *inter alia*, that: (1) the State failed to disclose exculpatory evidence; (2) the trial court erred by failing to excuse a juror and allowing hearsay evidence to be introduced at his trial; and (3) his trial and appellate counsels were ineffective for a multitude of reasons. In support, the petitioner attached 29 exhibits, including over 200 pages of the trial record.

¶ 27    On June 28, 2017, the petitioner filed a supplement to his second successive postconviction petition, arguing that his 51-year *de facto* life sentence violated the Illinois constitution's proportionate penalties clause and the eighth amendment of the United States Constitution, as

applied to him. The petitioner alleged that at sentencing the trial court did not consider any of the relevant mitigating factors, including that: (1) he grew up in extreme poverty and lived in a rodent infested house with no gas, electricity, running water, or phones; (2) he was physically abused by his father and moved often, depriving him of the opportunity to develop social and interpersonal skills; (3) he left home when he was only 14 years old and lived on the streets of Chicago, where he was threatened and robbed by gang members, and susceptible to their influence; (4) he started abusing drugs and alcohol, and committing crimes, at a young age; and (5) he had not committed a violent offense since turning 17, until the instant case. The petitioner further asserted that he should be referred for neuropsychological and psychological evaluations, to assess his cognitive, intellectual, and behavioral status and his risk of recidivism. In support, he attached, among other things, numerous articles on juvenile and adolescent brain research.

¶ 28    On August 1, 2018, the petitioner filed a second supplement to his successive postconviction petition, alleging the existence of newly discovered evidence supporting his *Brady* violation and actual innocence claims. In support, he attached numerous documents obtained through his FOIA requests, showing unrelated claims brought against the same police officers involved in his arrest and trial.

¶ 29    On August 17, 2018, the trial court dismissed the petitioner's second successive postconviction petition (including both supplements). [2]

¶ 30    Three days after the court entered its ruling, on August 20, 2018, the petitioner filed yet a third supplement to his second successive postconviction petition alleging the existence of newly discovered evidence supporting his claim that his sentence violated both the state and federal

_____

[2] It appears that since the petitioner never sought leave to file his second successive postconviction petition, the trial court outright dismissed this petition.

10

constitutions. In support, the petitioner attached a transcript of Professor Laurence Steinberg's expert testimony from the decision in the civil case of *Cruz v. U.S.*, No. 11-CV-787 (JHC) (U.S. D. C. Conn 2018).

¶ 31 On September 25, 2018,[3] the petitioner also filed a motion to reconsider the trial court's August 17, 2018, ruling.

¶ 32 On November 5, 2018, the petitioner further filed a petition to supplement the record with the decision in *People v. Harris*, 2018 IL 121932, arguing that it fully supported his argument that his *de facto* life sentence was unconstitutional. On November 20, 2018, the petitioner also filed a "motion to extend the record with scientific rationale." In support, he attached an October 1, 2018, memorandum entitled "*Re: Scientific Rationale to extend the Graham/Roper/Miller rationale upward from age 18-25*," written by Dr. James Garbarino, a consultant in child an adolescent development.

¶ 33 On December 7, 2018, the petitioner's third supplement to his second successive postconviction petition (including his petition to supplement the record and his motion to extend the record) was dismissed. In addition, the trial court denied the petitioner's motion to reconsider its August 17, ruling. In doing so, the trial court explicitly held that in *Harris*, our supreme court made clear that the protections of *Miller* and its progeny applied only to those offenders who were 17 or younger when they committed the crimes with which they were charged. The petitioner now appeals.

¶ 34                                   II.  ANALYSIS

---

[3] This filing was timely under the mailbox rule as it was posted by the petitioner on September 14, 2018. See *People v. Shines*, 2015 IL App (1st) 121070, ¶ 31 ("Under the mailbox rule, pleadings, [and] posttrial motions [citation], are considered timely filed on the day they are placed in the prison mail system by an incarcerated defendant [citation].").

¶ 35    At the outset, we note that it is unclear from the record whether the trial court treated the petitioner's third supplement to his second successive postconviction petition (and all its addendums) as: (1) an amendment to the already filed (and dismissed) second successive petition; (2) a separate, third successive postconviction petition; or (3) exhibits to the petitioner's motion to reconsider the court's August 17, dismissal of the second successive petition. The record only reveals that the petitioner never sought, and the trial court never granted him the requisite leave to file either his second successive petition or his third supplement to that petition. Instead, the trial court outright "dismissed" both. Nonetheless, in spite of these procedural ambiguities, because the parties on appeal agree that the proper issue before us is whether the petitioner should have been granted leave to file a successive petition premised on his as-applied challenges to the constitutionality of his *de facto* life sentence, we too proceed in this manner.

¶ 36    In this respect, on appeal, the petitioner contends that he sufficiently established the requisite cause and prejudice, and therefore should have been granted leave to file his successive petition and proceed with his sentencing claims. Relying on *Miller v. Alabama,* 567 U.S. 460 (2012) and its progeny, the petitioner argues that the legal and community standards pertaining to sentencing of young adults have dramatically changed since his original sentencing hearing in 2002 and his resentencing in 2005. Specifically, he asserts that in Illinois the imposition of a *de facto* life sentence (any sentence over 40 years) on a juvenile is not permitted without the trial court's consideration of the offender's youth and its attendant characteristics, as well as a finding of incorrigibility. The petitioner contends that recent holdings by our supreme court suggest that the laws regarding juveniles should be extended to young adults such as himself. He therefore asserts that because the trial court was required to sentence him to the minimum imposed 51-year term, regardless of any opportunity to consider his youth and his potential for recidivism, his

sentence violates both the eighth amendment of the United States constitution and the Illinois proportionate penalties clause. For the reasons that follow, we find that the petitioner has met his burden solely with respect to his proportionate penalties claim.

¶ 37    We begin by noting that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) provides a statutory remedy to criminal defendants who claim that substantial violations of their constitutional rights occurred either at trial or at sentencing. *People v. Edwards*, 2012 IL 111711, ¶ 21. The Act is not a substitute for an appeal, but rather, is a collateral attack on a final judgment. *Edwards*, 2012 IL 111711, ¶ 21. Accordingly, issues not presented in an original or amended petition will be deemed waived, and issues that have previously been raised and addressed on appeal will be barred pursuant to the doctrine of *res judicata*. See *Edwards*, 2012 IL 111711, ¶ 21; see also *People v. Sanders*, 2016 IL 118123, ¶ 24 (citing 725 ILCS 5/122-3 (West 2014)).

¶ 38    Our supreme court has repeatedly held that the Act contemplates the filing of only one petition without leave of court (725 ILCS 5/122-1(f) (West 2016)); see also *People v. Lusby*, 2020 IL 124046, ¶ 27. To obtain leave of court, the petitioner must demonstrate cause for his failure to raise the claim in the initial petition and prejudice from that failure. *Lusby*, 2020 IL 124046, ¶ 27. To show cause the petitioner must identify an objective factor that impeded his ability to raise a specific claim during his initial post-conviction proceedings. *Id.*; see also *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). To show prejudice the petitioner must demonstrate that the claim not raised during his initial postconviction proceedings so infected the resulting conviction or sentence that it violated due process. *Id.* It is the petitioner's burden to establish a *prima facie* showing of cause and prejudice before any further proceedings on his claims can occur. *People v. Bailey*, 2017 IL 121450, ¶ 24; *People v. Smith*, 2014 IL 115946, ¶ 30. A

motion for leave of court to file a successive postconviction petition will be denied where the petitioner's claims fail as a matter of law. *Id.*; see also *People v. Smith*, 2014 IL 115946, ¶ 35. Our review of the trial court's denial of a motion for leave to file a successive postconviction petition is *de novo*. See *Bailey*, 2017 IL 121450, ¶ 13.

¶ 39    At the outset, we note that the petitioner has sufficiently established cause for his failure to raise his Miller-based eighth amendment and proportionate penalties challenges in his earlier petitions.

¶ 40    This court has previously held that a postconviction petitioner establishes cause for filing a postconviction petition relying on *Miller* and its progeny, where those cases had not been decided at the time the petitioner filed an earlier postconviction petition. *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 20 (citing cases); see also *People v. Davis*, 2014 IL 115595, ¶ 42. In this case, although the petitioner filed his first postconviction petition in February 2010, and later sought leave to file his first successive postconviction petition in May 2013, both of which occurred after *Miller* had been decided, it was not until a year later that the Illinois Supreme Court first held that *Miller* applied retroactively to cases on collateral review. See *Davis*, 2014 IL 115595, ¶¶ 39. It is also clear that there has been much development in this area of the law since 2013. Specifically, it was not until 2019 that our supreme court held that a sentence of over 40 years' imprisonment for a juvenile, without a finding of incorrigibility was an unconstitutional *de facto* life sentence. See *People v. Buffer*, 2019 IL 122327, ¶ 27. Thus, consistent with the above precedent, we find that the petitioner has established cause for failing to raise his federal and state constitutional claims earlier. See *Rivera*, 2020 IL App (1st) 171430, ¶ 20; see also *People v. Minniefield,* 2020 IL App (1st) 170541, ¶ 31; *People v. Carrasquillo*, 2020 IL App (1st) 180534, ¶ 108.

¶ 41    Turning to the prejudice prong, for the following reasons, we find that the petitioner has successfully established the requisite prejudice only with respect to his proportionate penalties claim.

¶ 42    On appeal, the petitioner asserts that he has shown prejudice as to both his eighth amendment and proportionate penalties claims because it cannot be said, at this stage of postconviction proceedings, that either constitutional claim fails as a matter of law.  See *Smith*, 2014 IL 115946, ¶ 35.

¶ 43    The petitioner is incorrect with respect to his eighth-amendment challenge.  The petitioner's argument is rooted in the well-established legal developments governing the sentencing of juveniles that began with the seminal decision in *Miller,* 567 U.S. 460.  There, the United States Supreme Court held that the imposition of a mandatory life sentence without parole for juveniles under the age of 18 violated the eighth amendment's prohibition against cruel and unusual punishments. *Miller*, 567 U.S. at 465. The Supreme Court held that minors are constitutionally different from adults for sentencing purposes, being less mature and responsible, more impulsive, and more vulnerable to negative influences and peer pressure than adults, and not having the fully-formed character of adults so that their actions do not necessarily indicate irreversible depravity. *Id.* at 471-74.  Relying on these principles, our supreme court has since held that *Miller* and its progeny apply to defendants who committed offenses as juveniles and were sentenced to life, whether mandatory or discretionary, natural or *de facto*, and the sentencing court failed to consider their youth and its attendant characteristics when imposing the sentence. See *Buffer*, 2019 IL 122327, ¶ 27. Notably, our supreme court has also held that a prison sentence of over 40 years imposed on a juvenile offender constitutes a *de facto* life sentence in violation of the eighth amendment. *Id*., ¶ 41.

¶ 44    The petitioner readily acknowledges that he was over 18 at the time of his offense, but nonetheless argues that the legal developments that have sprung from *Miller* extend not only to juveniles but to young adults, such as himself, who was 19 when he committed the crimes. He contends that recent developments in neuroscience research establish that emerging adults share more salient characteristics with juveniles than adults. The petitioner asserts that his 51-year sentence was a *de facto* life sentence and that the trial court imposed it without considering in mitigation his youth as it related to his culpability and rehabilitation. Thus, the petitioner claims his sentence violates the eighth amendment under *Miller*.

¶ 45    Contrary to the petitioner's assertion, however, by now it has become "clear that the categorical findings made by *Miller* and its progeny under the federal eighth amendment apply only to juveniles." *People v. Carrion*, 2020 IL App (1st) 171001 ¶ 28; see also *Harris*, 2018 IL 121932, ¶¶ 49-61; *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37 (rejecting an attempt by a postconviction petitioner who was 18 years old at the time of his offense to mount an as-applied eighth amendment challenge to his 60-year sentence, based on the fact that the petitioner had been over the age of 18 at the time of the offense); see also *Minniefield*, 2020 IL App (1st) 170541, ¶ 37. Recently, and forcefully, our supreme court has reaffirmed that the demarcation for juvenile sentencing protections under the eighth amendment is "under age 18." See *Harris*, 2018 IL 121932, ¶¶ 49-61 (rejecting a facial challenge under the federal eighth amendment to a life sentence for an offender over 18 years old but under 21 years old, and conclusively noting, "the age of 18 marks the present line between juveniles and adults"). Since the petitioner here was 19 years old when he committed his crimes, he cannot avail himself of the eighth amendment. Accordingly, his age-based eighth amendment argument fails as a matter of law. As such, he cannot establish prejudice with respect to this claim.

¶ 46    The petitioner nonetheless contends that he should be permitted to proceed with his successive postconviction petition because he sufficiently established prejudice with respect to his proportionate penalties claims.  In support, the petitioner relies on recent statements made by our supreme court in *People v. Thompson*, 2015 IL 118151, ¶ 44, and *Harris*, 2018 IL 121932, ¶ 48, suggesting that offenders who were 18 years or older when they committed the crimes, should pursue as-applied proportionate penalties challenges by means of postconviction proceedings.  The petitioner further relies on law review articles, discussing the broad consensus in the scientific community that "the brains of young adults continue to develop into their mid-20s."  The petitioner contends that if his successive petition is permitted to proceed, he could "develop a record that he was more like an adolescent than an adult at the time of the offense and should have been treated as such at sentencing."  For the reasons that follow, we agree.

¶ 47    The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. "This constitutional provision requires the balancing of the twin goals of retribution and rehabilitation, which requires a careful consideration of all the factors in aggravation and mitigation, including defendant's age and mental health." *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 54.   The proportionate penalties clause embodies our society's evolving sense of moral decency.  *Id*.  Accordingly, a sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002) (*Leon Miller*).

¶ 48    The petitioner correctly points out that in *Thompson* and *Harris*, our supreme court twice

acknowledged that young adults—at least those who were 20 years of age or younger at the time

of their crimes—could rely on the evolving neuroscience and societal standards underlying the

rule in *Miller* to support as-applied challenges to life sentences brought pursuant to the Illinois

proportionate penalties clause (Ill. Const. 1970, art. I,§ 11). See *Thompson*, 2015 IL 118151, ¶ 44

(noting that a defendant, who was 19 years old at the time of his crime, could not bring such a

claim for the first time on direct appeal but was "not necessarily foreclosed" from asserting it in

postconviction proceedings); see also *Harris*, 2018 IL 121932, ¶ 48 (concluding that the as-

applied, youth-based sentencing claim of a defendant who was 18 years and 3 months old at the

time of his crime was "more appropriately raised" in postconviction proceedings). In doing so,

our supreme court seemed to have opened the door for a young-adult offender to demonstrate,

through an adequate factual record, that his own specific characteristics were so like those of a

juvenile that the imposition of a life sentence, absent the safeguards established in *Miller,* was

"cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of

[our] community." *People v. Klepper*, 234 Ill. 2d 337, 348-49 (2009). Nonetheless, our supreme

court provided no guidance as to exactly what would be necessary to overcome the bar for leave

to file a successive postconviction petition in such circumstances.

¶ 49    Unsurprisingly, a split has developed among our appellate courts as to how as-applied

proportionate penalties challenges to sentences imposed on young adult offenders should be

treated in the context of successive postconviction petitions.

¶ 50    Some of our courts have held that the individual circumstances of each defendant and his

crime should determine the outcome of such successive postconviction petitions. Factors these

courts have found relevant to the outcome include whether: (1) the offender was an active

participant in the offense; (2) the sentence imposed was discretionary rather than mandatory; (3)

the offender essentially received a sentencing hearing in which his or her youth and rehabilitative potential were considered as mitigating factors; and (4) the successive petition failed to allege facts showing how the petitioner's individual circumstances caused his or her brain to be more similar to that of a juvenile rather than a mature adult. See, *e.g.*, *Carrion*, 2020 IL App (1st) 171001, ¶¶ 30-33; *People v. Gomez*, 2020 IL App (1st) 173016, ¶¶ 37-38; *People v. McClurkin*, 2020 IL App (1st) 171274, ¶¶ 20-23; *Handy*, 2019 IL App (1st) 170213, ¶¶ 40-41; *People v. Moore*, 2020 IL App (4th) 190528, ¶¶ 38-41; *People v. White*, 2020 IL App (5th) 170345, ¶ 31; *People v. Ramsey*, 2019 IL App (3d) 160759, ¶¶ 22-23.

¶ 51     In contrast, other courts have held that successive postconviction petitions by youthful offenders under the proportionate penalties clause should be allowed, regardless of the offender's level of involvement in the offense or the discretionary nature of the sentences imposed. See *e.g.*, *Franklin*, 2020 IL App (1st) 171628, ¶¶ 68-69; *People v. Daniels*, 2020 IL App (1st) 171738, ¶¶ 2, 34; *People v. Ruiz*, 2020 IL App (1st) 163145, ¶¶ 1, 38-40; *People v. Johnson*, 2020 IL App (1st) 171362, ¶¶ 1-2, 15-16; *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109; *Minniefield*, 2020 IL App (1st) 170541, ¶ 47; *People v. Bland*, 2020 IL App (3d) 170705, ¶ 14. These decisions hold that it is premature to dismiss proportionate penalties challenges so early in the postconviction process, without providing the petitioners with an opportunity to fully develop the record necessary to support their claims. See *Ruiz*, 2020 IL App (1st) 163145, ¶¶ 53, 56; *Johnson*, 2020 IL App (1st) 171362, ¶ 34. According to these decisions, where petitioners support their proportionate penalties claims with "detailed, well-cited legal argument, set[ting] out why the protections in *Miller* and in the Illinois cases applying it, should benefit young adults," they state a claim that, "as a matter of law," they have been prejudiced by their justified failure to raise such a claim in an earlier proceeding. *Id.* In other words, the petitioners can

19

overcome the prejudice prong " 'by establishing a "catch-22"—without a developed record, [they] cannot show [their] constitutional claim[s] have merit,' " and without a meritorious claim " '[they] cannot proceed to develop a record.' " *Minniefield*, 2020 IL App (1st) 170541, ¶ 44, (quoting *Carrasquillo*, 2020 IL App (1st) 180534, ¶ 109)).

¶ 52    In the present case, the petitioner urges us to follow the rationale of the latter line of cases. In addition, he argues that regardless of which line of cases we follow, he is entitled to relief because his case involves a mandatory rather than a discretionary life sentence and therefore falls squarely within the holding of *People v. House*, 2019 IL App (1st) 110580-B, ¶ 65, *appeal docketed*, No. 1-12-5124 (Ill. Jan. 29, 2020). For the following reasons, we agree with the petitioner and find *House* instructive.

¶ 53    In *House*, after our supreme court already directed this court to reconsider an earlier opinion in light of *Harris*, this court held that a 19-year-old offender's mandatory life sentence was unconstitutional under the proportionate penalties clause as applied to him, vacated the sentence, and remanded the case for a new sentencing hearing. *House*, 2019 IL App (1st) 110580-B, ¶ 65. The court in *House* reasoned that, although the defendant was not a juvenile when he committed the offense, the fact that he was only 19 years old and served only as a lookout during the shooting was relevant in determining the appropriate sentence. *Id.*, ¶ 46, 63. The court also found relevant that the defendant had received the same sentence of mandatory natural life in prison as the actual shooter, whereas another co-defendant with culpability similar to that of the defendant had already been released from prison because he had been only 17 years old at the time of the offense. *Id.* As the court in *House* reasoned:

    "The trial court's ability to take any [mitigating] factors into consideration was negated by the mandatory nature of defendant's sentence. The trial court was also precluded from

20

considering the goal of rehabilitation in imposing the life sentence, which is especially relevant in defendant's case. Given defendant's age, his family background, his actions as a lookout as opposed to being the actual shooter, and lack of any prior violent convictions, we find that defendant's mandatory life sentence of natural life shocks the moral sense of the community." *Id.*, ¶ 64.

¶ 54　　Just as in *House*, as a result of the mandatory nature of the minimum sentence, the petitioner here was sentenced to *de facto* life imprisonment without the trial court's ability to consider any mitigating factors or the requisite goal of rehabilitation. Contrary to the State's assertion, there can be no doubt that the 51-year sentence imposed was the mandatory minimum permitted under the law. At the time of sentencing, the murder conviction carried a minimum of 20-years imprisonment (730 ILCS 5/5-8-1(a)(1)(a) (West 2005)), plus the mandatory 25-year firearm enhancement for the petitioner's personal discharge of the firearm that caused Williams' death (730 ILCS 5/5-8-1 (d)(iii)(West 2005)). In addition, the attempted murder conviction carried a minimum of 6 years (730 ILCS 5/5-8-1(a)(3) (West 2005)) and the sentences had to be served consecutively (730 ILCS 5/5-8- 4(a)(1) (West 2005)). Accordingly, under this mandatory sentencing scheme, regardless of any mitigating evidence attendant to the petitioner's youth, the trial court was bound to impose the 51-year *de facto* life term.

¶ 55　　Even more disturbingly, in the present case, the record clearly establishes that the petitioner was never afforded a sentencing hearing in any meaningful sense of the word. The record reveals that the petitioner impetuously chose to represent himself at both his original and resentencing hearings and then offered no mitigating evidence or arguments at either proceeding. Even more glaringly, the record shows that at that resentencing hearing, conducted three years

after the completion of the trial, the trial court was not even in possession of the PSI, as it noted on the record that the PSI was not in the petitioner's file.

¶ 56    In *Harris*, our supreme court clearly envisioned an evidence-based factual inquiry when it declined to consider a successive petition asserting an as-applied, youth-based sentencing claim on direct appeal where the record included "only basic information about [the] defendant, primarily from the presentence investigation report," an evidentiary hearing had not been held, and the trial court had made no findings "on the critical facts needed to determine whether *Miller* applie[d] to [the] defendant as an adult." *Harris*, 2018 IL 121932, ¶ 46; *Daniels*, 2020 IL App (1st) 171738, ¶ 31.

¶ 57    No such evidence-based factual hearing was conducted here. The record is devoid of any evidence about the evolving science and its impact on the petitioner's case. Moreover, as already noted above, not even the most basic information about the petitioner from the PSI was before the trial court on resentencing. Contrary to the dissent's position, the petitioner was by no means afforded two bites at the apple. Rather, the trial court committed reversible error at the initial sentencing hearing, and then on remand, automatically reimposed the same sentence without considering any mitigating factors, and without reviewing even the most basic information that would have been found in the petitioner's original PSI.

¶ 58    Under these circumstances, and taking into account the petitioner's present allegations of poverty, parental and drug abuse, a harsh life on the streets, and gang involvement beginning at age 13, we believe that the dismissal of the as-applied proportionate penalties claim at this early juncture in the postconviction proceedings is premature. *Daniels*, 2020 IL App (1st) 171738, ¶ 31. While on remand, the petitioner may or may not be able to make a substantial showing to support his claim, the evidence he points to now certainly indicates that he had a harsh childhood

that could have inhibited his development and caused him to act impulsively. *Id.*, ¶ 33.

Accordingly, without a fully developed record, we reject the State's invitation to find that the petitioner's claim fails as a matter of law or that his petition and supporting documentation are insufficient to justify further proceedings. *Id.*

¶ 59　　In so holding, we are mindful that the law has continued to trend in the direction of increased protections for youthful offenders, such as the petitioner. Relevant to the present appeal, our legislature has recently changed the law to make a defendant convicted of first degree murder eligible for parole after serving only 20 years, if the defendant was under 21 years old at the time when he committed the crime, and was sentenced after the law took effect on June 1, 2019. See Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); Pub. Act 101-288, § 5 (eff. Jan. 1, 2020) (amending 730 ILCS 5/5-4.5-110(b) and renumbering as 730 ILCS 5/5-4.5-115(b)). Under this recent enactment, if a 19-year-old offender were convicted today of the same offenses that the petitioner was convicted of in 2002, he would be eligible for parole after just 20 years, rather than the 50.1 years required by the petitioner's sentence. *Id.*, ¶ 40 (citing Pub. Act 101-288 (eff. Jan. 1, 2020)).

¶ 60　　However, because this sentencing change has not been made retroactive, youthful offenders, like the instant petitioner, who committed the crime while younger than 21, but who were sentenced prior to June 1, 2019, have only one recourse—to seek resentencing, after which, even if their sentences remain the same, they will be permitted to appear before the parole board after 20 years and demonstrate (or fail to demonstrate) their rehabilitation.

¶ 61　　　　　　　　　　　　　　　III.  CONCLUSION

¶ 62　　Accordingly, for the aforementioned reasons, we find that the petitioner has established the

necessary cause and prejudice on his as-applied proportionate penalties claim to be permitted to proceed with his successive postconviction petition. We therefore grant the petitioner's motion for leave to file his successive postconviction petition and remand for further proceedings consistent with this order.

¶ 63        Reversed and remanded.

¶ 64        JUSTICE LAVIN, dissenting:

¶ 65        I would affirm the circuit court's judgment denying defendant leave to file his successive postconviction petition because he has not established prejudice. See *People v. Lusby*, 2020 IL 124046, ¶ 52; *People v. Carrion*, 2020 IL App (1st) 171001, ¶ 25. Defendant's proportionate penalties claim therefore cannot serve as a basis to reverse and remand the case.

¶ 66        As set forth by the majority, the proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. 1, § 11. A sentence violates the proportionate penalties clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002).

¶ 67        Given this standard, defendant's 51-year sentence in no way shocked the moral sense of the community or was cruel or degrading. Defendant, who was legally an adult at age 19, stood on a residential street corner, where he fired multiple times from his rifle at rival gang members passing by in their car. He essentially forewarned these acts, then intentionally shot two victims in the chest, murdering one and attempting to murder the other. Defendant was the principal offender and committed the offenses while on probation. *Cf. People v. House*, 2019 IL App (1st) 110580-B, ¶ 32, *appeal allowed*, No. 125124 (Ill. Jan. 29, 2020) (finding the 19-year-old

defendant's mandatory life sentence for murder via accountability, where he acted only as a lookout and had no criminal background, shocked the moral conscience of the community and therefore violated the proportionate penalties clause). In that sense, defendant's sentence adequately represents his personal culpability. See *House*, 2019 IL App (1st) 110580-B, ¶ 46. I would add that his behavior is also the very type that could have killed innocent bystanders or children playing video games in their own homes, a result that is all too familiar according to our daily news headlines.

¶ 68    Moreover, even assuming *Miller* principles applied, defendant had every opportunity at sentencing *and resentencing* to present mitigating circumstances, including his youth. We thus disagree with the majority's conclusion that defendant "was never afforded a sentencing hearing in any meaningful sense of the word" or an "evidence-based factual hearing." See *supra* ¶¶ 55, 57. Here, he had not just one bite at the apple, but two.

¶ 69    At his initial sentencing hearing, defendant's PSI showed that despite his youthful age, he had a substantial criminal background involving weapons, drugs, and multiple parole violations. The PSI also reflected that defendant had a good family with educator parents and suffered no abuse or neglect, which directly contradicts his current successive postconviction allegations. See *People v. Rogers*, 197 Ill. 2d 216, 222 (2001) (Illinois courts have "consistently upheld the dismissal of a post-conviction petition when the record from the original trial proceedings contradicts the defendant's allegations"). In aggravation, in addition to the victim impact statements, the State presented testimony from several police officers about defendant's gang activities involving guns and shootings, which occurred a few years and just some months before the offenses that ultimately landed him in prison. One officer testified to knowing defendant as the "enforcer" of his gang, *i.e.*, the person responsible for punishments on the gang's behalf and

murder contracts. While in jail, defendant was also found in possession of a homemade knife. In argument, the State highlighted defendant's violent and antisocial tendencies from a young age, stating he was beyond rehabilitation. Defendant offered no argument, evidence in mitigation, or comments in allocution. The record thus shows that defendant's murder and attempted murder was the culmination of a life ill-lived.

¶ 70    As the majority reports, prior to imposing the sentence, the trial court commented on the record that defendant was entitled to a "substantial" sentence, which the minimum of 51 years reflected. In imposing the sentence, the court noted that defendant had been involved in criminal activity and gangs since age 13 and would be released around age 70, at which time he could hopefully be a productive member of society. The comments indicate that the trial court was fully aware of mitigating circumstances, including defendant's youth, but found defendant's behavior showed he was beyond rehabilitation and permanently incorrigible, making the 51-year sentence a just one.

¶ 71    On direct appeal, this court remanded defendant's case after concluding he was improperly admonished under Rule 401 of his potential sentencing range; this was required before he waived counsel and proceeded *pro se* on his posttrial motion and sentencing hearing. While true, defendant was nonetheless made aware *before* his initial sentencing that he was subject to a 45-year-to-life sentence for murder, plus a consecutive sentence for attempted murder. Regardless, remand was for a violation of supreme court rules, not a sentencing error. At resentencing, the parties had the opportunity to present new evidence and argument, but they both essentially rested on that from the first sentencing hearing, held only three years prior, and also on the original PSI. Defendant, choosing to act *pro se* a second time, presented nothing, and the parties do not indicate an updated PSI was submitted. Following this, the judge who oversaw

defendant's trial and initial sentencing hearing again gave him 51 years in prison. It thus appears that the parties and the court adopted the very same evidence and reasoning as at the first and more extensive sentencing hearing. Defendant does not necessarily dispute this in his brief.

¶ 72        Thus, I believe the court was able to consider the relevant *Miller* factors of defendant's age of 19 (adulthood), his particular immaturity, impulsivity, and failure to appreciate risks and consequences; his family and home environment; defendant's degree of participation in the offenses and pressures from gangs; defendant's mental capacity and any incompetence from his stunted high school education; and defendant's prospects for rehabilitation, including his criminal background and family. See *Lusby*, 2020 IL 124046, ¶ 34 (noting the *Miller* factors); *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 72 (noting, the proportionate penalties clause demands consideration of the defendant's character). Notwithstanding these factors, the court found defendant deserved the minimum 51 years mandated by statute. See *Lusby*, 2020 IL 124046, ¶ 35 (in response to an eighth amendment challenge, noting that no single *Miller* factor is dispositive, but a court must review the proceedings to "ensure that the trial court made an informed decision based on the totality of the circumstances that the defendant was incorrigible" and the sentence was appropriate). Nothing suggests the trial court would have given defendant a lesser sentence even if the court had discretion to do so. Thus, defendant's *de facto* "life sentence passes constitutional muster under *Miller*," assuming *Miller* applies. See *Lusby*, 2020 IL 124046, ¶ 52. Having found this, I do not believe the sentence violates the proportionate penalties clause either.

¶ 73        For the reasons stated, I do not believe defendant's petition presents a legally cognizable claim or meets the high bar needed to advance as a successive postconviction petition. See *Carrion*, 2020 IL App (1st) 171001, ¶¶ 25, 34.