# Illinois Official Reports

## Appellate Court

---

*People v. Shines*, 2015 IL App (1st) 121070

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEWARD SHINES, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-12-1070 |
| Filed<br>Rehearing denied | February 4, 2015<br>June 16, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from defendant's convictions for aggravated fleeing and eluding a police officer, his argument that one of his convictions should be vacated under the one-act, one-crime doctrine was rejected on the grounds that the aggravated fleeing and eluding a police officer involved separate acts, including violating the speed limit and disobeying traffic control devices. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-C4-41309; the Hon. Noreen V. Love, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Jonathan Yeasting, both of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Jeffrey Wynn Allen, Assistant State's Attorney, of counsel), for the People. |

JUSTICE HYMAN delivered the judgment of the court, with opinion. Presiding Justice Pucinski and Justice Mason concurred in the judgment and opinion.

## OPINION

¶ 1    On appeal, defendant, Deward Shines, contends that his case should be remanded for consideration of *pro se* posttrial claims of ineffective assistance of trial counsel under *People v. Krankel*, 102 Ill. 2d 181, 187-89 (1984). But, as the State argues in its brief, Shines filed his allegation of ineffective assistance of counsel after the trial court lost jurisdiction over the case because 30 days had passed from the entry of the final judgment. Shines successfully petitioned the Illinois Supreme Court to treat his tardy filing as a late notice of appeal. *Shines v. Hyman*, No. 115941 (Ill. May 13, 2013) (supervisory order).

¶ 2    Shines' second contention is that one of his two convictions for aggravated fleeing and eluding must be vacated under the one-act, one-crime doctrine. Following a bench trial, Shines was found guilty of two counts of aggravated fleeing and eluding a peace officer and various traffic offenses, then sentenced to concurrent terms of two years' imprisonment. We hold that Shines was properly convicted of both counts of aggravated fleeing and eluding a peace officer based on separate acts, and those convictions are not precluded by the one-act, one-crime doctrine.

¶ 3                    Background

¶ 4    This appeal stems from a November 23, 2010, incident in Maywood, Illinois, which resulted in police charging Shines with two counts of aggravated fleeing and eluding a peace officer, two counts of unlawful use of a weapon by a felon, one count of possession of firearm ammunition without a firearm owner's identification card, one count of possession of cannabis, and various traffic offenses.

¶ 5    At trial, Maywood police officer Matias testified that at about 7 p.m. on November 23, 2010, he received a call to investigate an armed robbery that had occurred near Fifth Avenue and Madison Street. The officer spoke to the victim, who gave a description of one of the three assailants and told him that the offenders were driving an older model tan Buick. When the officer took the victim back to the scene to retrieve a backpack that he dropped during the robbery, the victim pointed to a Buick being driven east and approaching Fifth Avenue and said, "That's them right there." The officer told the victim to get out of the squad car, and he and his partner, Officer Guzman, followed the Buick.

¶ 6    When the driver stopped at a stoplight, Officer Matias got out of the squad car and went to the driver's side, while Officer Guzman stood at the rear passenger door. There were three people in the Buick, and both officers were in full uniform. Officer Matias tapped on the window and asked the driver, whom he identified as Shines, to roll the window down. Shines looked at the officer, but did not comply. Officer Matias then tried to open the door by grabbing the handle, but the door was locked. Matias hit the window again and told Shines to open the door or roll down the window. The officer then saw what appeared to be a silver

handgun tucked between Shines' right thigh and the center console. The officer pulled out his weapon and told Shines to stop and get out of the car. He did not point the gun, or discharge it, but held it at his side. Shines looked at the officer and drove away.

¶ 7    The officers ran back to the squad car, activated the lights and sirens, and began chase. Using a loudspeaker, Officer Matias ordered Shines to stop as they drove westbound on Madison Street where the posted speed limit was 25 miles per hour. The officer testified that he was driving 50 miles per hour during the chase, and Shines was pulling away from him, so he concluded that Shines was traveling in excess of 50 miles per hour. Shines made a left turn onto Ninth Avenue through a red light and continued southbound. The posted speed limit on Ninth Avenue was 25 miles per hour, and Officer Matias estimated that Shines was, again, traveling in excess of 50 miles per hour.

¶ 8    Shines then turned westbound on Van Buren, and drove through two stop signs, before turning northbound on Eleventh Avenue. Shines made a right turn on Adams Avenue and another into an alley between Ninth and Tenth Avenues. He stopped in the alley, got out, and ran eastbound toward Ninth Avenue. Officer Matias gave chase to Shines, while Officer Guzman held the two individuals inside the Buick.

¶ 9    Officer Matias followed Shines as he ran into the basement of his residence and into a bedroom. He then took Shines into custody, handcuffed him, and searched his person. The officer recovered a chrome-and-black Smith and Wesson magazine containing 11 rounds from Shines' right front pants pocket, and a large bag of cannabis and a scale on the floor of the bedroom, within reach of Shines. Other officers arrived, and as they searched the basement for the weapon, a younger female yelled at them and tried to push them out of the house. The woman refused to comply with their orders to leave the residence or go upstairs, and she was "placed under arrest for obstructing."

¶ 10    Later, Officer Matias returned to the Buick and saw Officer Guzman search the Buick and recover cannabis from the center console. On cross-examination, Officer Matias testified that he was familiar with Shines and had been present on three to five occasions when Shines was arrested.

¶ 11    The State introduced a certified driver's abstract showing that Shines' driver's license was suspended on November 23, 2010, a certified copy of Shines' prior conviction for armed robbery, and a certified vehicle record showing that the Buick was registered to both Shines and Curtis Townsend at Shines' address. The parties stipulated to the amount of plant material recovered from the bedroom and from the Buick, which tested positive for the presence of cannabis.

¶ 12    After the State rested, defense counsel moved for a directed finding, focusing primarily on the evidence relating to the drug charge. Counsel argued that the car was registered to two people and that multiple persons were inside the car before the drugs were found. Counsel also noted that Shines was not seen in possession of the drugs found in the bedroom and that there was no proof of Shines' residency inside that bedroom. The court granted Shines' motion for a directed finding as to the drug charge, but denied it as to the remaining counts.

¶ 13    Shines then called his girlfriend, Dana Calice, as a witness. She testified that about 7 p.m. on November 23, 2010, she and Shines left his house in his gold Buick to get something to eat. They were the only occupants, and when Shines turned right at Fifth and Madison, police started shining a spotlight on his car. An officer approached, told Shines to "[g]et the fuck out

of the car," then shot his gun into the driver's side panel. Calice identified a photograph of Shines' car showing a bullet hole in that location.

¶ 14    After the gunshot, Shines told Calice to get on the floor and started to drive off. Shines eventually stopped the car in an alley behind his house and ran off, leaving her in the car. Calice testified that she did not see Shines with a gun that evening, and although the police searched the car for a gun, they were unable to find one.

¶ 15    On cross-examination, Calice acknowledged that the photo of Shines' car was taken after Shines was released from jail–four to six months after the incident–and that Shines had been shot at before, on "less than five" occasions. She further testified that when Shines was driving away from the police, he drove "fast" and did not stop at any red lights or stop signs. She heard five gunshots coming from the direction of the police, as Shines was running from the alley, but acknowledged that she did not file a formal complaint with the police department or the State's Attorney's office.

¶ 16    Carrie Manganese testified that she is the girlfriend of Shines' brother, Aubry Shines. On November 23, 2010, she was at Shines' house, when he and Calice left to get some food. About 15 minutes later, Shines entered through the back basement door and went up the steps to the top floor. Manganese heard a bang on the back door 5 or 10 minutes later, and when she went to investigate, she saw three or four police officers, and Shines and Aubry were handcuffed on the floor. She asked the officers what was going on, and they told her to go upstairs, but she did not comply with their order.

¶ 17    On cross-examination, Manganese testified that Shines called her phone and talked to his brother. Shines told his brother someone was shooting at him. Manganese heard one gunshot, then saw Shines run into the basement and up the stairs. After the police arrived, Manganese was arrested because she "wouldn't go upstairs."

¶ 18    Officer Guzman testified in rebuttal that, at 7 p.m. on November 23, 2010, he was on duty in full uniform with his partner, Officer Matias, when they responded to a call of an armed robbery. They spoke with the victim, and as they were returning him to the scene to retrieve his backpack, he saw a tan Buick and identified the driver as the attacker. The officers dropped off the victim and followed the Buick to Fifth and Madison, where the driver had stopped at the stoplight. The officers got out of their squad car, and Officer Matias approached the driver's side of the Buick, while he stood by the rear passenger door. Officer Guzman testified that there were two, not three, people in the car–the driver, whom he identified as Shines, and a female in the front passenger seat.

¶ 19    Officer Guzman saw Officer Matias speak to Shines, but he could not hear what was said. Shortly thereafter, Officer Matias yelled, "He has a gun," and Shines "took off" in the Buick. Officer Guzman did not hear or see any gunshots. The officers ran back to their squad, activated the emergency lights and sirens, and followed the car. Officer Guzman radioed dispatch to relay the direction of the Buick as Officer Matias used an overhead speaker to tell Shines to stop. The officers were traveling over 40 miles per hour, and the Buick was pulling away. Shines drove through a red light at Ninth and Madison, and took several turns, but the officer could not recall where. Shines then turned into an alley and fled on foot. Officer Matias followed. Officer Guzman stayed with the passenger and did not hear or see anyone discharge a weapon at that time.

¶ 20    At the close of evidence and argument, the court agreed with a number of defense counsel's arguments regarding the credibility of the officers' testimony and found Shines not

guilty of the offenses related to the firearm magazine. The court did observe, however, that there was testimony from both sides showing that Shines was speeding and that the police were chasing and attempting to curb him with their sirens activated. The court concluded that Shines "did, in fact, commit those infractions" and found him guilty of both counts of aggravated fleeing and eluding a peace officer, and the other traffic offenses.

¶ 21 Shines presented and argued a motion for a finding of not guilty or a new trial, which was denied by the court. At the sentencing hearing, arguments were presented by respective counsel, and Shines exercised his right to allocution. Shines was then sentenced to concurrent two-year terms on his two aggravated fleeing and eluding a peace officer convictions.

¶ 22 On April 9, 2012, Shines, *pro se*, filed a letter in the circuit court, which he described as a "motion of appeal." In that letter, Shines alleged that the court's findings of guilt were erroneous "because of ineffective council [*sic*]" and "because of false testimony" of the State's witnesses. He specifically alleged that counsel had not gotten Officer Matias's "gun checked for the shooting" or investigated "the cameras" on Fifth Avenue. He further contended that counsel should have called more witnesses and gotten police reports earlier to prove that Officer Matias lied about having probable cause to stop his car. Shines also complained of discrepancies in the officers' testimonies and alleged that Officer Matias had "lied" when he denied shooting his vehicle. The trial court took no action on or considered the "motion of appeal."

¶ 23 Shines thereafter filed a motion for a supervisory order with the supreme court. On May 13, 2013, the supreme court allowed Shines' motion and directed this court to "allow the 'motion for appeal' filed by Shines, *pro se*, on April 9, 2012, to stand as a validly filed notice of appeal." *Shines v. Hyman*, No. 115941 (Ill. May 13, 2013) (supervisory order).

¶ 24 In this court, Shines does not challenge the sufficiency of the evidence to sustain his convictions. Rather, he contends that the trial court erred by failing to conduct a preliminary inquiry into his posttrial claims of ineffective assistance of counsel, as required by *Krankel*, 102 Ill. 2d at 187-89, and requests that we remand for that purpose.

¶ 25                                                    Analysis

¶ 26 Under *Krankel* and its progeny, where defendant makes a *pro se* posttrial allegation of ineffective assistance of counsel, the trial court should conduct an adequate inquiry into the factual basis of the claim. *People v. Moore*, 207 Ill. 2d 68, 79 (2003). The pleading requirements for raising a *pro se* claim of ineffectiveness of counsel are somewhat relaxed; however, a defendant must still meet the minimum requirements necessary to trigger a *Krankel* inquiry. *People v. Bobo*, 375 Ill. App. 3d 966, 985 (2007).

¶ 27                                      Trial Court Lost Jurisdiction

¶ 28 As an initial matter, the State maintains that the trial court no longer had jurisdiction over Shines' case when he filed his letter on April 9, 2012, and we agree.

¶ 29 A trial court generally loses jurisdiction to hear a cause at the end of the 30-day window following the entry of a final judgment. *People v. Bailey*, 2014 IL 115459, ¶ 8. The court entered final judgment against Shines on March 7, 2012, and the court lost jurisdiction over the matter after April 6, 2012, a Friday.

¶ 30     The record shows that Shines filed his "motion of appeal" on Monday, April 9, 2012, and that the supreme court subsequently allowed his motion for a supervisory order directing this court to allow his "motion of appeal" to suffice as a validly filed notice of appeal. There is no indication that Shines requested that the motion be construed as anything other than a notice of appeal or that the supreme court actually did so. As a result, we conclude that when Shines filed his *pro se* letter in the trial court on April 9, 2012, complaining of counsel's effectiveness, the trial court had lost jurisdiction to consider the matter, and it was thus not properly before the trial court. Merely filing a motion with the office of the clerk is not enough to put a motion before the court, and where a *pro se* motion is not properly before the trial court, it has no obligation to consider it. *People v. Rucker*, 346 Ill. App. 3d 873, 883-84 (2003).

¶ 31     Shines, however, contends in his reply brief that we should construe the letter as being filed within the 30-day period through the application of the mailbox rule. Under the mailbox rule, pleadings, including posttrial motions (*People v. Tlatenchi*, 391 Ill. App. 3d 705, 713 (2009)), are considered timely filed on the day they are placed in the prison mail system by an incarcerated defendant (*People v. Jennings*, 279 Ill. App. 3d 406, 413 (1996)).

¶ 32     Shines asserts that his filing was timely under "a straightforward application of the mailbox rule" because it was file-stamped on April 9, 2012, and "the only possible way for the filing not to be timely, with no Sunday mail, is if it were placed in the prison mail system Saturday April 7, and arrived halfway across the state in time to be file stamped on Monday." He contends that so fast a delivery is an "exceedingly remote possibility" and thus asks us to infer that the document was mailed in a timely fashion. The mailbox rule, however, does not allow for an inference.

¶ 33     To rely on the date of mailing as the filing date, a defendant must provide proof of mailing by filing a proof of service that complies with the requirements of Illinois Supreme Court Rule 12(b)(3) (eff. Dec. 29, 2009). This requires the defendant to file an affidavit stating the time and place of mailing, the address on the envelope, and the fact that proper postage was prepaid. *Tlatenchi*, 391 Ill. App. 3d at 711. Shines did not file the affidavit with his document, and, thus, he may not avail himself of the mailbox rule.

¶ 34     Shines also attaches a copy of an affidavit that he submitted with his motion for a supervisory order, as an exhibit to his reply brief, and asks us to take judicial notice of it. In the affidavit, a paralegal with the office of the State Appellate Defender avers that she called the Illinois River Correctional Center's mailroom and spoke to the manager, who informed her that the center keeps track of when documents are mailed and confirmed that Shines' letter was mailed on April 3, 2012.

¶ 35     We initially note that attachments to briefs that are not included in the record are not properly before us. *McGee v. State Farm Fire & Casualty Co.*, 315 Ill. App. 3d 673, 679 (2000). But, even if we were to take judicial notice of this affidavit, we note that the allegations contained in the affidavit regarding the mailing are entirely hearsay (*People v. Banks*, 237 Ill. 2d 154, 180 (2010)) and insufficient to establish the date of mailing for purposes of the mailbox rule. See *Huber v. American Accounting Ass'n*, 2014 IL 117293, ¶ 18 (holding that postage label showing purchase date was insufficient to show proof of mailing for purposes of mailbox rule); *Secura Insurance Co. v. Illinois Farmers Insurance Co.*, 232 Ill. 2d 209 (2009) (holding that plaintiff's notice of appeal was untimely where it failed to submit certificate or affidavit of mailing under Rule 12(b)(3)); *Tlatenchi*, 391 Ill. App. 3d at 711 (holding "proof of service" submitted by incarcerated litigant, which was unnotarized but otherwise followed

requirements of Rule 12(b)(3), was insufficient to establish timely mailing because proof of service did not constitute "affidavit" as required by Rule 12(b)(3)).

¶ 36    Shines next maintains that, because the affidavit was attached to his motion for a supervisory order, which was uncontested by the State and granted by the supreme court, the issue of when the letter was mailed "has already been litigated and decided" and this court is now "precluded" from "relitigati[ng]" it. Not so. Neither Shines' motion nor the affidavit was entered in the record on appeal, and the supervisory order does not reflect that the supreme court decided when the filing at issue was mailed, or made any mention of a mailing date, describing the document as "filed on April 9, 2012."

¶ 37    Moreover, the record reflects no request on Shines' part to have the supreme court construe the document as timely filed in the trial court, revesting that court with jurisdiction over the matter. Rather, the supreme court granted Shines' request to have this court allow that document as a validly filed notice of appeal. In the absence of any proof to the contrary, we conclude on the record before us that the date of filing is April 9, 2012, the date a clerk file-stamped it. Therefore, Shines has failed to bring to the trial court's attention a specific and timely claim of ineffective assistance of counsel sufficient to trigger the duty to conduct an inquiry under *Krankel*, and there is no cause for remand. *Rucker*, 346 Ill. App. 3d at 883-84.

¶ 38    Shines next contends that any "procedural defects" in his filing should be excused because the trial court provided inadequate admonishments about his appellate rights. He contends that these admonishments "collapsed *** the two step process of first filing a motion challenging the court's ruling[,] *** then, if relief is denied, filing within thirty days a notice of appeal" into a single step, and caused him to file a "hybrid document," titled "motion of appeal" which also challenged his counsel's effectiveness. We note, however, that, even if the court's admonishments were inadequate in that they invited Shines to submit a single document, the court stated that Shines must file that document within 30 days of sentencing. Shines indicated his understanding of the requirement, but he did not meet the 30-day filing deadline or request an extension. Under these circumstances, Shines' failure to do so cannot be excused by the court's allegedly faulty admonishments. *People v. Dominguez*, 2012 IL 111336, ¶ 22.

¶ 39    Because we determine that the court lacked jurisdiction over the matter when Shines' letter was filed, we need not consider the remainder of the State's claims: that Shines' allegations were insufficient to necessitate inquiry, that the allegations were refuted by the record, and that Shines should be judicially estopped from requesting a *Krankel* inquiry where he petitioned the supreme court to construe his letter as a notice of appeal.

¶ 40    In so holding, we must express some level of concern at this outcome. Under the state of existing supreme court precedent and supreme court rules, we are compelled to find that the circuit court no longer had jurisdiction over Shines' case when the letter complaining of counsel's effectiveness was untimely filed. We acknowledge, though, that it is highly likely that Shines, in fact, mailed this document at a time when, had he provided the required affidavit, the result would have been favorable to him. It appears, instead, that he was unaware of this requirement. Although a *pro se* defendant must comply with the rules of procedure required of those represented by counsel (see *People v. Stevenson*, 2011 IL App (1st) 093413, ¶ 39), we question the fairness of this outcome, particularly in cases, like here, where an incarcerated defendant is without counsel and is complaining of counsel's ineffectiveness. Although courts often warn defendants of the numerous risks and perils of self-representation in criminal matters, according to *Krankel* and its progeny, a convicted defendant with a

posttrial claim of ineffective assistance of counsel must navigate with insufficient education and little, if any, understanding of the complex legal issues and the applicable procedural rules. And do so, at times with little or no ability to communicate in English. In reality, rare, indeed, is the legally competent *pro se* criminal defendant. We therefore invite the supreme court to consider whether this outcome makes sense in circumstances such as these.

¶ 41                                    One-Act, One-Crime Claim

¶ 42     Shines next contends that one of his two fleeing and eluding convictions must be vacated under the one-act, one-crime doctrine because they both arise from the same continuous act of driving away from the officers. He acknowledges that the charges differ in that one alleges an "aggravating circumstance of exceeding more than 21 miles per hour over the speed limit" while the other alleges an "aggravating circumstance of disobeying traffic control devices." But, he contends that these are not separate acts, but merely "alternative theories of liability." The State responds that, by driving in excess of 21 miles per hour over the speed limit and disobeying traffic signals, Shines committed separate acts, and where he was properly charged with and found guilty of committing those acts, no one-act, one-crime violation occurred.

¶ 43     Because Shines failed to object to this error at trial, he requests that we review it under the second prong of the plain-error doctrine. *People v. Harvey*, 211 Ill. 2d 368, 389 (2004). The first step in conducting plain-error review, however, is to determine whether error occurred at all. *People v. Walker*, 232 Ill. 2d 113, 124 (2009).

¶ 44     Under the one-act, one-crime doctrine, a criminal defendant may not be convicted of more than one offense "carved from the same physical act." *People v. King*, 66 Ill. 2d 551, 566 (1977); see also *People v. Hampton*, 406 Ill. App. 3d 925, 943 (2010). For purposes of one-act, one-crime analysis, an "act" has been defined as any overt or outward manifestation that will support a direct offense. *People v. Rodriguez*, 169 Ill. 2d 183, 188 (1996). If defendant committed multiple acts, then multiple convictions lie even though a relationship exists between the acts. *People v. Campbell*, 2014 IL App (1st) 112926, ¶ 83. To sustain multiple convictions where a common act is part of both offenses, the charging instrument must indicate the State's intent to treat the defendant's conduct as multiple separate acts. *People v. Crespo*, 203 Ill. 2d 335, 345 (2001); *Rodriguez*, 169 Ill. 2d at 188. Whether multiple convictions violate the one-act, one-crime doctrine presents a question of law and receives this court's *de novo* review. *People v. Johnson*, 237 Ill. 2d 81, 97 (2010).

¶ 45     Our determination requires a two-step inquiry. *People v. Miller*, 238 Ill. 2d 161, 165 (2010); *People v. Span*, 2011 IL App (1st) 083037, ¶ 83. First, the court must determine whether the defendant's conduct involved a single act or multiple acts. *Miller*, 238 Ill. 2d at 165. If the conduct involved multiple acts, the second step is to determine if any of the offenses are lesser-included offenses. *Miller*, 238 Ill. 2d at 165. (As to the second step, Shines does not contend that either conviction is a lesser included offense, so we need not address it.)

¶ 46     Shines attempts to describe the differences in his two convictions as mere "attendant circumstances" or "alternative theor[ies]" of culpability for the same conduct." It is evident from the record, however, that the State charged Shines with two counts of fleeing and eluding, based on two separate acts: (1) Shines' driving at a high rate of speed; and (2) his contravention of traffic control devices. And, the circuit court found that Shines had committed two separate acts. Because Shines committed more than one act during the course of an offense, his multiple convictions do not violate the one-act, one-crime doctrine.

¶ 47        We affirm the judgment of the circuit court of Cook County.

¶ 48        Affirmed.