2021 IL App (1st) 181093-U

No. 1-18-1093

Order filed January 28, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 10688 |
| | ) | |
| LATASHA KENNEDY, | ) | Honorable |
| | ) | Joan Margaret O'Brien, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for armed robbery is affirmed where the evidence was sufficient to establish her accountability for the offense. Defendant's convictions for two counts of aggravated fleeing or attempting to elude a peace officer are affirmed because multiple convictions do not violate the one-act, one-crime rule. Defendant's 26-year sentence for armed robbery is affirmed over her contention it was excessive.

¶ 2    Following a bench trial, defendant Latasha Kennedy was found guilty of one count of armed robbery with a firearm and two counts of aggravated fleeing or attempting to elude a peace

officer. She was sentenced to a total of 26 years' imprisonment. On appeal, defendant contends the State failed to establish her accountability for armed robbery, one of her two convictions for aggravated fleeing or attempting to elude a peace officer should be vacated under the one-act, one-crime rule, and her 26-year sentence for armed robbery was excessive. We affirm.[1]

¶ 3    Defendant was charged with one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)), which alleged she and Clarence Adams knowingly took money and a bag from the person of Marvin Jackson by the use of force or threatening the imminent use of force, while armed with a firearm.[2] Defendant was also charged with two counts of aggravated fleeing or attempting to elude a peace officer, which alleged she, the driver of a motor vehicle, having been given a visual or audible signal by a police officer directing her to stop the vehicle, willfully failed or refused to obey such direction and fled or attempted to elude the officer and, in so doing, drove at least 21 miles per hour over the speed limit (625 ILCS 5/11-204.1(a)(1) (West 2014)) and disobeyed two or more more traffic control devices (625 ILCS 5/11-204.1(a)(4) (West 2014)).[3]

¶ 4    Prior to trial, the State filed a motion to admit proof of other crimes to show *modus operandi*, knowledge, and defendant's absence of an innocent state of mind. Specifically, the State sought to admit evidence that Adams robbed a man named Cesar Rodriguez as Rodriguez was walking away from a gas station shortly before the incident that gave rise to this case. A vehicle pulled up next to Rodriguez, Adams exited it and robbed him at gunpoint, then reentered the passenger side of the vehicle with Rodriguez's belongings, and the vehicle left. Rodriguez

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

[2] Adams pled guilty prior to trial.

[3] Defendant was also charged with one count of aggravated unlawful restraint (720 ILCS 5/10-3.1 (West 2014)), which the State *nol-prossed* before trial.

identified Adams to police, as well as the license plate number of the vehicle. The State alleged defendant told police she was driving the vehicle at the Rodriguez incident, but did not know what was happening outside the vehicle. The court granted the State's motion, finding "this was a continuing course of conduct" and the incidents "did have many similarities regarding *modus operandi*." The court also explained "this evidence could be used to show knowledge of what was happening at the time of the crime as well as motive for being involved."

¶ 5     The State also filed a pretrial motion *in limine* to admit Adams's statements as defendant's co-conspirator. Specifically, the State sought to admit that Adams said, "[G]ive me all your s*** before I kill you mother f*****", "Where's your money…give me all your money," and, "I know you got more – I want it all" when robbing Rodriguez, and "[G]ive me all you got" when robbing Jackson. The court granted this motion.[4]

¶ 6     Also prior to trial, the State offered defendant a plea deal. The court advised defendant that, if she went to trial and was found guilty, it did not "know if the minimum [sentence] is something that [the court] would consider" depending on the evidence presented at trial. The court reiterated essentially the same admonishment to defendant at a later date prior to trial.

¶ 7     At trial, Daniel Williams testified he was filling his gray or silver Volkswagen Passat at a gas station at approximately 2:30 a.m. on June 14, 2015, accompanied by his girlfriend.[5] When he finished pumping gas and returned to the driver seat, Adams approached him with a gun and

---

[4] The State's pretrial motions also sought to admit the testimony of Terrence Tyler, who Adams robbed at a gas station prior to robbing Rodriguez, and Adams's statements to Tyler while robbing him. The court granted both motions, but the State did not call Tyler at trial.

[5] Williams was not included in the State's pretrial motions regarding other crimes evidence and Adams's statements as a co-conspirator. However, the court allowed his testimony "to explain how [the Volkswagen] got into the mix."

ordered him to hand over his keys, which he did. Williams and his girlfriend exited the Volkswagen, and defendant got in the Volkswagen and drove away. Williams notified police and subsequently identified Adams in a photo array. In court, he identified a photograph of his Volkswagen and its license plate number.

¶ 8 Cesar Rodriguez testified he walked to a gas station at East 159th Street and South Halsted Street in Harvey between 5 a.m. and 5:30 a.m. on June 14, 2015. He left the gas station and saw a silver Volkswagen as he was walking southbound on Woodbridge Avenue. The Volkswagen stopped six to seven feet in front of Rodriguez, and Adams exited the passenger side and pointed a gun at Rodriguez's head.

¶ 9 Adams said, "Give me all your s*** before I kill you," so Rodriguez gave him $20, his cell phone, and his wallet. Adams demanded Rodriguez's clothing, so Rodriguez removed all of his clothing except for his socks and underwear. As Rodriguez was removing his clothes, Adams "started just throwing them" toward the Volkswagen while still pointing the gun at him. Rodriguez heard a woman's voice inside the Volkswagen say, "Hurry up, hurry up, come on, let's go." Adams entered the passenger side of the Volkswagen and left. Rodriguez subsequently identified Adams to police in a photo array.

¶ 10 On cross-examination, Rodriguez testified he did not see the woman in the Volkswagen.

¶ 11 Marvin Jackson testified he was at a gas station at West 127th Street and South Pulaski Road in Alsip at approximately 5:30 a.m. on June 14, 2015. Adams, who Jackson subsequently identified to police, approached Jackson's vehicle with a gun pointed at him, poked his ribcage with the gun, and demanded money. Adams grabbed a $50 bill out of Jackson's hand and his

sunglasses from his face, then punched Jackson in the face and demanded more money. Jackson gave Adams $15 from his pocket and the keys to his vehicle while Adams threatened to shoot him.

¶ 12 Jackson saw defendant, whom he identified in court, sitting in a silver Volkswagen Passat with the passenger door open, from which Adams had initially approached him. The Volkswagen was to Jackson's left, on the opposite side of a gas pump. Jackson heard defendant say, "Come on, let's go," and she "motioned to [Adams] let's go." Jackson briefly made eye contact with defendant. Defendant never got out of the Volkswagen during this incident. Jackson gave Adams a bag from the passenger-side floor of his vehicle, and then Adams returned the Volkswagen and "took off." Jackson called police and provided the first three numbers of the Volkswagen's license plate.

¶ 13 Jackson confirmed that a video recording from the gas station accurately depicted the events on the morning of June 14, 2015. The State moved this video into evidence. The video depicts a white sedan, which Jackson identified as his vehicle, stop at a gas station pump. Approximately one minute later, a second vehicle, which Jackson identified as "the car they was driving," stops parallel to Jackson's vehicle, on the opposite side of the gas pump. A person, whom Jackson identified as "the man that robbed [him]," exits the front passenger seat of the second vehicle and opens the driver's door of Jackson's vehicle. This man leans toward the driver's seat of Jackson's vehicle for approximately one minute, then returns to the passenger seat of the other vehicle. The second vehicle then drives away.

¶ 14 Evergreen Park police sergeant Abel Salazar testified he was on duty, in uniform, and driving a marked police vehicle on the morning of June 14, 2015, when he received notice of an armed robbery involving a gray Volkswagen with a particular license plate number. Salazar saw

and pursued the Volkswagen with his vehicle's lights and sirens activated. He saw defendant, whom he identified in court, drive approximately 45 miles per hour in a 20 miles per hour speed limit zone, and saw her drive through six stop signs on 97th Street. Salazar pursued defendant's vehicle onto Central Park Avenue, where she drove through more stop signs. He saw the Volkswagen pass houses on the 9600 block of South Central Park Avenue. Defendant drove into a parking garage, and Salazar went to the top of the parking garage on foot. He opened a door on the top level of the parking garage and saw Adams and defendant "in front of the car just looking at each other talking to each other." Salazar arrested defendant.

¶ 15 Evergreen Park detective Angela Brakowski testified she also participated in the pursuit of the Volkswagen. She was in uniform and driving a marked police vehicle with lights and sirens activated when she saw the Volkswagen disobey multiple stop signs and drive as fast as 84 miles per hour. The State entered into evidence a video recording of the pursuit from the in-car camera in Brakowski's police vehicle.

¶ 16 Detective Christopher Lecompte testified he was involved in the pursuit of the Volkswagen as well, and drove in excess of 70 to 75 miles per hour when he was trying to catch up to it. He was in an unmarked police vehicle with lights and sirens activated. The State entered into evidence a video recording of the pursuit from the in-car camera in Lecompte's police vehicle.

¶ 17 Alsip police detective Justin Reilly testified he was assigned to investigate the armed robbery of Jackson on June 14, 2015. Defendant, whom Reilly identified in court, was in custody at the police station when Reilly arrived. Officer Kociolek had already interviewed defendant, and informed Reilly that defendant claimed she did not know Adams and that Adams had forced her to drive a vehicle at gunpoint.

¶ 18 Reilly determined through investigation that defendant did know Adams. He gave defendant *Miranda* warnings and then interviewed her. Defendant initially reiterated the "same story" she told Kociolek, but when confronted with the information Reilly had discovered, she admitted she had lied to Kociolek about not knowing Adams. During the interview, defendant was "calm, kind of carefree, cooperative, and a little friendly." She stated she was in an off-and-on relationship with Adams and, the night before the robbery, argued with him by text messages and phone calls about "financial issues." Adams arrived at defendant's home, without her permission, in a silver Volkswagen, which he said he borrowed. He told defendant to drive the Volkswagen, so she drove it to 147th Street in Harvey. Adams exited the Volkswagen, but defendant did not know where he went. He returned to the Volkswagen and told her to keep driving.

¶ 19 Defendant drove to a gas station at 127th and Pulaski in Alsip, where she parked next to a gas pump, with another vehicle on the other side of the pump. Adams exited the Volkswagen and pointed "something" at a person in the other vehicle and took a bag from that person. Defendant saw "what may have been a struggle between *** Adams and the unknown individual" in the other vehicle. Adams returned to the Volkswagen, and defendant drove away. The next thing she remembered was being involved in "a high-speed pursuit" and coming to a stop in a parking garage. She did not stop for the police because she was "a little scared" and did not know what would happen if she did stop.

¶ 20 On cross-examination, Reilly testified he did not ask defendant why she accompanied Adams in the Volkswagen. Defendant stated she did not know what Adams was going to do when he stopped the Volkswagen on "numerous occasions." "She didn't say anything about any

conversations that they may have had with one another." Defendant did not describe the object Adams pointed at the occupant of the other vehicle at the Alsip gas station.

¶ 21    On redirect examination, Reilly testified defendant stated she did not know what was happening outside the Volkswagen when it stopped. She never stated she saw a weapon in the Volkswagen. She never stated she had been threatened with a weapon, or at any time felt she was in fear for her life, or was afraid of Adams.

¶ 22    Miguel Candero testified he was delivering newspapers at approximately 6 a.m. on June 14, 2015, when he found a gun in a driveway on the 9600 block of South Central Park Avenue. He called police, who arrived shortly thereafter.

¶ 23    Evergreen Park police officer Switalski testified he responded to Candero's call at approximately 6 a.m. on June 14, 2015. He met Candero outside a house on the 9600 block of South Central Park Avenue, and Candero pointed out a gun and a magazine on the driveway. Switalski remained on scene until an evidence technician arrived and recovered the gun and magazine.

¶ 24    Oak Lawn police officer Caroline Stinnett testified she was on duty, in uniform, and driving a marked police vehicle on the morning of June 14, 2015. Between 5:30 and 6 a.m., she responded to a radio call regarding a fleeing vehicle in a parking garage. When Stinnett arrived at the parking garage, she was assigned to collect evidence from the scene, including the Volkswagen defendant had been driving, which Stinnett identified by its license plate number.

¶ 25    In a series of photographs, Stinnett identified items she recovered from the interior of the Volkswagen. Stinnett recovered six cell phones from the front interior area of the Volkswagen.

From the rear driver-side seat, Stinnett recovered a briefcase that contained two letters addressed to Jackson and a prescription bottle belonging to him.

¶ 26    Stinnett also identified items she recovered from the third level of the parking garage in a series of photographs. These included two wallets, one containing an identification card for a Josefin Arias and one containing a receipt with Rodriguez's name on it. She also recovered a seventh cell phone, and a wristlet containing defendant's identification card and Adams's bank card.

¶ 27    Alsip police evidence technician James Tyszko testified he was assigned to process items recovered from Adams's person on the morning of June 14, 2015. Tyszko identified these items in photographs he took, including $757.80 in cash, Rodriguez's Firearm Owner's Identification (FOID) card, Illinois identification card, and bank card, Adams's driver's license, broken sunglasses, Jackson's keys, and three cell phones.

¶ 28    Defendant moved for a directed finding with respect to the armed robbery count, arguing that "fleeing and eluding d[id] not make her responsible for what happened substantively with the charged of armed robbery." The State responded defendant "played the role of a get-away driver" and "was present on scene when that armed robbery occurred." In rebuttal, defendant argued that just because defendant was "a get-away driver does not mean [she] ha[d] the requisite intent, knowledge and accountability that is necessary to sustain a conviction for armed robbery." The court denied defendant's motion.

¶ 29    Defendant testified she and Adams dated from July to December 2013. When Adams was arrested in March or April 2015, defendant paid his $500 bond. He was supposed to pay defendant

back by June 13, 2015, but did not. On June 14, 2015, Adams texted defendant and told her he did not have the $500, and they argued "back and forth" via text and telephone.

¶ 30 Adams came to defendant's home between 3:30 a.m. and 4 a.m. and said he had her money. Adams drove defendant in a silver vehicle to defendant's friend's house, where defendant collected $17 her friend owed her. Adams then drove to a gas station at 127th and South Wentworth Avenue. Defendant did not see a gun in the vehicle and did not talk with Adams. At the gas station, Adams told defendant to drive, so she moved to the driver seat and adjusted the radio while Adams walked toward the gas station. Defendant did not see Adams go in. He returned to the vehicle three to five minutes later and told defendant to drive. Adams did not have anything in his hands and defendant did not think anything was wrong; she was still waiting to go to Adams's home to retrieve the money he owed her.

¶ 31 Adams told defendant to drive on the expressway, then told her to exit at either 147th Street or 159th Street. Adams said he was going to his aunt's house and told defendant to stop on a residential block, which she did. Adams exited the vehicle, but did not say where he was going. He returned three to five minutes later; he did not throw anything into the vehicle, and defendant did not see anything under his jacket. Defendant did not see Adams put a gun to anyone's head, and she did not say, "Come on, come on, hurry up" to him.

¶ 32 Adams was "agitated" and yelled at defendant to "hurry up and drive." Defendant told Adams she was driving him home. She got lost, pulled into a gas station to turn around, and stopped by a gas pump. Adams exited the vehicle and approached another vehicle on the other side of the pump; defendant did not see a gun in his hand. Defendant could not see Adams or the driver of the

other vehicle. Defendant heard Adams talking to the driver of the other vehicle, but could not hear what he said. She did not see him point anything at the driver of the other vehicle.

¶ 33   "After a little while," Adams returned and threw a "little suitcase" or a "work bag" into the vehicle. He sat down and defendant saw a gun on his lap. He "aggressive[ly]" told defendant to drive, so she did. Defendant saw a police officer as she drove on Pulaski. She then drove in a "high-speed chase" involving police, in which she drove "about 80 miles an hour." Defendant drove into a "parking lot" and got out of the Volkswagen. Adams grabbed her arm and they ran to the "ledge" at the end of the parking lot. Police arrived via a stairway and arrested defendant.

¶ 34   Defendant testified she did not know what Adams was going to do at any point on June 14, 2015. She denied she agreed with him to rob anyone, take anyone's money, or use a gun against anyone. When she got into the vehicle with Adams, she did not know he was going to "take stuff from people," and while she was with him, she did not know "he was stealing stuff from people."

¶ 35   On cross-examination, defendant denied she saw "a guy walking down the street" when she and Adams arrived at a residential area in Harvey. When Adams got back in the vehicle, she assumed he had gone to his aunt's house. Defendant denied she saw Jackson at the gas station. She acknowledged she lied to Kociolek about not knowing Adams, and about him robbing and kidnapping her.

¶ 36   The court found defendant guilty on all counts. In announcing its ruling, the court stated that "the get-away car driver is a textbook example of accountability." The court noted that, per defendant's own testimony, Adams made no "current threat or a future threat" to her. The court found defendant was not credible "for many, many different reasons," and concluded the evidence of her guilt was "overwhelming."

¶ 37    Defendant filed a motion for a new trial, which argued the State failed to establish her accountability because  Adams "acted unilaterally without the knowledge or intent of [defendant] that an Armed Robbery was going to take place, or that one was anticipated." At the hearing on that motion, the State argued defendant's "conduct in waiting for [Adams] while he was outside of the car with the gun certainly shows her acquiescence into [*sic*] the crime of armed robbery *** She supplied a means to escape for the defendant, she failed to offer help to the victims, she didn't call police, and she didn't abandon the crime when she had the first opportunity to do so." The court denied defendant's motion for a new trial.

¶ 38    At the sentencing hearing, both parties confirmed the Presentence Investigation report (PSI) was accurate. The PSI indicated defendant had two prior felony drug convictions in 1997 and 2000. It also contained information about her family, educational, and employment histories. The court stated it had reviewed the PSI.

¶ 39    In aggravation, Chicago police detective William Donnelly testified Adams robbed a man named Terrance Tyler at gunpoint at a gas station on June 14, 2015. After robbing Tyler, Adams got into a gray vehicle, driven by a woman, with a license plate number that matched that of the Volkswagen. In mitigation, defendant argued she had a "distinct possibility" of rehabilitation given her background, that her criminal history was nonviolent, and that she was "scared for her safety" during the commission of this offense. In allocution, defendant apologized to Jackson and stated she never agreed to "do this" with Adams.

¶ 40    The court sentenced defendant to 28 years' imprisonment for armed robbery and 3 years' imprisonment on each count of aggravated fleeing or attempting to elude a peace officer, with all sentences to run concurrently. In announcing its ruling, the court noted that defendant's "role in

this was certainly less than what Mr. Adams' role was" and that "[h]er background is not a background of violence."

¶ 41 Defendant filed a motion to reconsider sentence, which argued her sentence for armed robbery was excessive and constituted "a tax upon the defendant for proceeding to trial," and that she should only be sentenced on one count of aggravated fleeing and attempting to elude a peace officer because both counts were predicated on the same conduct. The court reduced the armed robbery sentence to 26 years, and left the two 3-year sentences for aggravated fleeting and attempting to elude a peace officer unchanged. The court specifically rejected defendant's argument that her sentenced constituted a "trial tax," and reiterated it had considered her role in the offense, her criminal background, and the information in the PSI.

¶ 42 On appeal, defendant first challenges her conviction for armed robbery (720 ILCS 5/18-2(a)(2) (West 2014)). Specifically, defendant contends the State failed to prove her accountability where the evidence was insufficient to establish she shared Adams's intent to commit the armed robbery of Jackson.

¶ 43 "Upon review of a question as to a defendant's accountability for an offense, we must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Fernandez*, 2014 IL 115527, ¶ 13. We do not retry a defendant, and we do not substitute our judgment for that of the trier of fact with respect to the weight of the evidence or the credibility of witnesses. *People v. Sutherland*, 223 Ill.2d 187, 242 (2006). We will reverse a conviction where the evidence is so improbable, unreasonable, or unsatisfactory as to justify a reasonable doubt of the defendant's guilt. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 44    A person commits armed robbery when he knowingly takes property from a person by the use of force or threatening the imminent use of force, and is armed with a firearm. 720 ILCS 5/18-1(a) (West 2014); 720 ILCS 5/18-2(a)(2) (West 2014). There is no dispute Adams committed the armed robbery of Jackson.

¶ 45    To hold defendant accountable for that armed robbery, the State had to establish that, either before or during the commission of the offense, and with the intent to promote or facilitate such commission, she solicited, aided, abetted, agreed or attempted to aid Adams in the planning or commission of the offense. 720 ILCS 5/5-2(c) (West 2014). To prove defendant possessed the intent to promote or facilitate the crime, the State could present evidence showing either (1) defendant shared the criminal intent of Adams, or (2) defendant and Adams had a common criminal design. See *Fernandez*, 2014 IL 115527, ¶ 21.

¶ 46    "Under the common-design rule, if 'two or more persons engage in a common criminal design or agreement, any acts in furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts.' " *Id.*, ¶ 13 (quoting *In re W.C.*, 167 Ill. 2d 307, 337 (1995)). " 'Evidence that a defendant voluntarily attached [her]self to a group bent on illegal acts with knowledge of its design supports an inference that [s]he shared the common purpose and will sustain h[er] conviction for an offense committed by another.' " *Id.* (quoting *In re W.C.*, 167 Ill. 2d at 338). A common design may be inferred from the surrounding circumstances; words of agreement are not required. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. " 'Proof that the defendant was present during the perpetration of the offense, that [s]he fled from the scene, that [s]he maintained a close affiliation with h[er] companions after the commission of the crime, and

that [s]he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability.' " *People v. Ealy*, 2019 IL App (1st) 161575, ¶ 32 (quoting *People v. Perez*, 189 Ill. 2d 254, 267 (2000)). " 'A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group.' " *People v. Cowart*, 2017 IL App (1st) 113085-B, ¶ 34 (quoting *People v. Cooper*, 194 Ill. 2d 419, 435 (2000)). "Nor is active participation in the offense a prerequisite to guilt by accountability." *People v. Ramos*, 2020 IL App (1st) 170929, ¶ 56.

¶ 47    We find the evidence sufficiently established defendant's accountability for Adams's armed robbery of Jackson. Jackson's testimony established defendant was in the driver seat of the Volkswagen at the Alsip gas station when Adams robbed him. Defendant made eye contact with Jackson during the robbery through the open passenger side door, and said to Adams, "Come on, let's go." When Adams returned to the Volkswagen with Jackson's property, defendant drove away. A reasonable factfinder could infer defendant knew Adams was robbing Jackson and waited for him to complete the robbery before transporting both Adams and Jackson's property away from the scene. Jackson's testimony alone was sufficient to establish defendant's criminal liability for armed robbery. See *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009) ("The testimony of a single witness, if positive and credible, is sufficient to convict.").

¶ 48    Moreover, defendant made no effort to withdraw from the robbery. A defendant's membership in a common criminal enterprise is presumed to continue until she communicates her intent to withdraw "(1) by wholly depriving the group of the effectiveness of [her] prior efforts in furtherance of the crime; (2) giving timely warning to the proper law enforcement authorities; or (3) otherwise making proper efforts to prevent the commission of the crime." *People v. Jones*,

376 Ill. App. 3d 372, 386 (2007); 720 ILCS 5/5-2(c)(3) (West 2014). Defendant did none of these things. Although defendant knew Adams was robbing Jackson, she did not get out of the Volkswagen, drive away before Adams returned, or summon police. On the contrary, the officers' testimony established defendant led police on a chase, which a reasonable factfinder could interpret as her attempt to escape with stolen property. There is no dispute Jackson's belongings were in the Volkswagen when defendant was arrested in the parking garage. Thus, defendant's behavior in the immediate aftermath of the robbery supported the trial court's finding of guilt.

¶ 49    Further, the State's other-crimes evidence established defendant's knowledge of and willing participation in Adams's robbery of Jackson. "Evidence of other crimes is admissible to establish a defendant's accountability." *People v. Hale*, 2012 IL App (1st) 103537, ¶ 26. In particular, other crimes evidence can be used to refute a defendant's claim of innocence and to dispel the suggestion she joined in the crime out of shock and fear for her own safety. *People v. Hale*, 326 Ill. App. 3d 455, 465 (2001).

¶ 50    Rodriguez's testimony blocked defendant's ability to argue she was unaware of what was about to happen when Adams approached Jackson. Rodriguez described a robbery that occurred in an almost identical manner to Jackson's robbery. In both incidents, Adams pulled up to the victims in the Volkswagen driven by defendant, got out, robbed the victims at gunpoint while verbally threatening them, then returned with stolen property to the Volkswagen, which defendant drove away. Both robberies occurred at or near gas stations in the south suburbs of Chicago within 30 minutes of each other. Thus, the other-crimes evidence corroborated Jackson's testimony, and supported an inference defendant knew exactly what would happen when she and Adams pulled up next to Jackson at the Alsip gas station.

¶ 51    Defendant's inconsistent statements to police supported the trial court's finding of guilt as well. See *People v. Green*, 2012 IL App (4th) 101034, ¶ 37 (a defendant's "inconsistent stories" may be evidence of her guilt). Defendant initially claimed that Adams, a stranger, forced her to drive the Volkswagen at gunpoint, which was untrue. When confronted by Reilly, she admitted she knew defendant and had been communicating with him before the robbery. A reasonable factfinder could conclude defendant made false statements to police in an effort to minimize her role as Adams's accomplice.

¶ 52    Altogether, the evidence allowed a reasonable factfinder to conclude defendant and Adams were partners in an armed robbery spree during the early morning hours of June 14, 2015, which culminated with the armed robbery of Jackson at the Alsip gas station and subsequent police chase.

¶ 53    Defendant contends "the State proceeded under shared intent theory" but "failed to present sufficient evidence suggesting that [defendant] shared Adam's intent to rob Jackson." Essentially, defendant interprets the State's theory of accountability at trial as strictly a shared intent theory, and suggests we can only affirm her conviction if the evidence was sufficient to establish she shared Adams's intent. However, defendant cites no authority in support of that proposition.

¶ 54    Contrary to defendant's suggestion, when we review the sufficiency of the evidence, we are not confined to the manner in which the State argued the evidence at trial. We need not decide which specific theory of liability the State presented at trial, and we express no opinion as to whether the State actually proceeded under a shared intent theory. Rather, we review all of the evidence presented at trial and ask whether the factfinder could reasonably conclude the State proved defendant's guilt beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 117-18

(2007). Given the evidence presented at trial in this case, we find the State did prove defendant guilty beyond a reasonable doubt.

¶ 55    Defendant next contends her sentence for armed robbery is excessive in light of her "limited involvement in th[e] offense and a lack of a history of criminal violence" and her potential for rehabilitiation, and because the court imposed a "trial tax" upon her.

¶ 56    A trial court has broad discretion in sentencing, and we afford great deference to sentencing decisions because the trial court " 'observed the defendant and the proceedings and is in a better position to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age.' " *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010) (quoting *People v. Stacey*, 193 Ill. 2d 203, 209 (2000)). Upon review, we do not substitute our judgment for that of the trial court simply because we might have weighed sentencing factors differently. *Id.* We will only disturb a sentencing decision upon a showing of abuse of discretion. *People v. Snyder*, 2011 IL 111382, ¶ 36. A sentence within the statutory guidelines is presumed to be proper, and only constitutes an abuse of discretion if the sentence is greatly at variance with the spirit and purpose of the law, or is manifestly disproportionate to the nature of the offense. *Id.*

¶ 57    "A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship." *People v. Williams*, 2019 IL App (1st) 173131, ¶ 21. Thus, the trial court must consider all factors in aggravation and mitigation. *Id.* "The defendant bears the burden of making an affirmative showing that the sentencing court did not consider the relevant factors." *Id.*

¶ 58    Armed robbery is generally a Class X felony, and the sentencing range for a Class X felony is 6 to 30 years. 720 ILCS 5/18-2(b) (West 2014); 730 ILCS 5/4-4.5-25(a) (West 2014). However,

armed robbery while armed with a firearm as charged here requires a 15-year enhancement to the term of imprisonment imposed by the court. 720 ILCS 5/18-2(a)(2), (b) (West 2014). Thus, including the mandatory 15-year firearm enhancement, the total sentencing range for defendant was 21 to 45 years. The trial court imposed a sentence of 26 years, within the statutory guidelines. Thus, we presume the trial court's sentence was proper. See *Snyder*, 2011 IL 111382, ¶ 36. Defendant can only overcome this presumption by showing her sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense. See *Id.*

¶ 59    Defendant has not made such a showing. The most important factor is the seriousness of the crime. *Alexander*, 239 Ill. 2d at 214.  As the court noted, defendant played a "significant" role in this armed robbery, and her actions showed "disregard for the lives of innocent people that would have been on the streets," including Jackson. Including the mandatory 15-year firearm enhancement, defendant's minimum possible sentence was 21 years, and her 26-year sentence is closer to that than it is to the maximum of 45 years. We cannot say such a sentence is manifestly disproportionate to the nature of the offense.

¶ 60    Defendant argues the trial court did not adequately consider her "limited involvement" in the armed robbery, her nonviolent criminal history, and her potential for rehabilitation. Factors in mitigation include, in relevant part, a defendant's lack of criminal activity for a substantial period before the offense at issue, and her attitude and character indicating she is unlikely to reoffend. 730 ILCS 5/5-5-3.1(a)(7), (9) (West 2014). The trial court may also consider a defendant's character, credibility, social environment, age, habits, as well as the nature and circumstances of the offense. *People v. Minor*, 2019 IL App (3d) 180171, ¶ 27. A defendant's rehabilitative potential

is relevant, but may not be given greater weight than the seriousness of the offense. *Alexander*, 239 Ill. 2d at 214. Moreover, the presence of mitigating factors does not require a minimum sentence and does not preclude a maximum sentence. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. We presume the trial court considered all of the relevant mitigating factors, and a defendant must present affirmative record evidence the trial court failed to consider mitigating factors to overcome that presumption. *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51.

¶ 61 We find defendant has not overcome that presumption. The trial court explicitly stated it considered all of the mitigating factors defendant cites and the information in the PSI. Defendant also raised the same arguments at the sentencing hearing and the hearing on her motion to reconsider sentence as she does on appeal. Thus, the trial court not only read the mitigating evidence in the PSI; it heard the mitigating evidence argued as well, and is presumed to have considered it. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. In particular, we cannot conclude the trial court disregarded mitigating evidence when it reduced the sentence defendant now challenges. Thus, defendant has not established the trial court disregarded any mitigating evidence.

¶ 62 Defendant also argues the trial court abused its discretion because, in discussing the State's 15-year plea offer prior to trial, it "informed [defendant] that it did not know if it would consider the minimum available sentence of 21 years in prison if [defendant] were found guilty after a trial." Essentially, defendant suggests the court imposed a "trial tax." While a court may not penalize a defendant for asserting her right to trial (*People v. Means*, 2017 IL App (1st) 142613, ¶ 21), that is not what happened here. Prior to trial, the trial court advised defendant it might learn facts during trial that could make the minimum sentence inappropriate. After trial, it sentenced her within and near the lower end of the guidelines. We see no reason to consider that a "trial tax;" rather, the

court was forthright with defendant about the potential risks of going to trial. Moreover, we must consider defendant's sentence in light of the entire record (*People v. Charleston*, 2018 IL App (1st) 161323, ¶ 32), so the court's brief pretrial comments on this point are not a basis for altering defendant's sentence. Accordingly, we find defendant's 26-year sentence for armed robbery was proper.

¶ 63    Finally, defendant contends her convictions for two counts of aggravated fleeing or attempting to elude a police officer violate the one-act, one-crime rule of *People v. King*, 66 Ill. 2d 551 (1977), because her "act of fleeing from the police was one continual act which supports only one conviction." In *King*, our supreme court held "a criminal defendant may not be convicted of multiple offenses when those offenses are all based on precisely the same physical act," also known as the one-act, one-crime rule. *People v. Coats*, 2018 IL 121926, ¶ 11. Whether a defendant was incorrectly sentenced for multiple offenses based upon the same act is a question of law subject to *de novo* review. *People v. Cross*, 2019 IL App (1st) 162108, ¶ 147.

¶ 64    Defendant concedes she did not properly preserve this argument for appeal, but asks us to review it under the plain error doctrine. See Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Her motion to reconsider sentence raised this one-act, one-crime argument, but she did not object when the court imposed sentences on both counts of aggravated fleeing and attempting to elude a peace officer. To preserve a claim of sentencing error, both a contemporaneous objection and a written posttrial motion raising the issue are required. *People v. Hillier*, 237 Ill. 2d 539, 544 (2010). Thus, defendant has forfeited this issue unless she can demonstrate plain error. See *Id.*; *People v. Enoch*, 122 Ill. 2d 176, 186-87 (1988). The first step in conducting plain error review is to determine whether error occurred at all. *People v. Shines*, 2015 IL App (1st) 121070, ¶ 43. We find no error here.

¶ 65    *Shines* guides our analysis. In that case, the defendant argued that "one of his two fleeing and eluding convictions must be vacated under the one-act, one-crime doctrine because they both arise from the same continuous act of driving away from the officers." *Shines*, 2015 IL App (1st) 121070, ¶ 42. We rejected that argument because

> "the State charged Shines with two counts of fleeing and eluding, based on two separate acts: (1) Shines' driving at a high rate of speed; and (2) his contravention of traffic control devices. And, the circuit court found that Shines had committed two separate acts. Because Shines committed more than one act during the course of an offense, his multiple convictions do not violate the one-act, one-crime doctrine." *Id.*, ¶ 46.

¶ 66    As in *Shines*, here, defendant was charged with, and found guilty of, one count of aggravated fleeing and eluding a peace officer premised on driving at a high rate of speed, and one count premised on disobeying traffic control devices. These are two separate acts, so multiple convictions do not violate the one-act, one-crime rule. See *Id.* Accordingly, we affirm defendant's two convictions for aggravated fleeing or attempting to elude a peace officer.

¶ 67    For the foregoing reasons, we affirm defendant's convictions.

¶ 68    Affirmed.